## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| NIKI LEE ESMAN, | CV 20-150-BLG-SPW |
| Plaintiff, | |
| vs. | **ORDER** |
| KILOLO KIJAKAZI, *Acting Commissioner of Social Security Administration*, | |
| Defendant. | |

Plaintiff Niki Lee Esman ("Esman") has filed a complaint pursuant to 42 U.S.C. §§ 405(g), 1383(c) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner"), denying her claim for disability insurance benefits under Title II, and supplemental security income under Title XVI, of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-83f. (Docs. 2, 11.) The Commissioner subsequently filed the Administrative Record ("A.R."). (Doc. 9.)

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of the Commissioner's denial and remand for further proceedings. (Doc. 11.) The motion is fully briefed and ripe for the Court's review. (*See* Docs. 12, 13.)

1

For the reasons set forth herein, and after careful consideration of the record and applicable law, the Court finds this matter should be REMANDED for further proceedings.

## I.     PROCEDURAL BACKGROUND

Esman filed her application for disability insurance benefits and supplemental security income on August 3, 2018.  (A.R. 172-190.)  The Social Security Administration initially denied Esman benefits on October 17, 2018.  (A.R. 21.)  Esman subsequently requested a hearing by an Administrative Law Judge ("ALJ").  (*Id.*)  A hearing was held on February 11, 2020.  (*Id.*)  ALJ Michael A. Kilroy issued a written decision on March 12, 2020, finding Esman not disabled.  (A.R. 36.)  Esman requested review of the ALJ's decision before the Appeals Council, but the request was denied.  (A.R. 5.)  Esman thereafter filed the instant action.  (Doc. 2.)

## II.    LEGAL STANDARDS

### A.     Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  *See*

2

*also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d

653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

## B.    Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) he suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work he previously performed, or any other substantial gainful employment which exists in the national economy.  42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A).  A claimant must meet both requirements to be classified as disabled.  *Id.*

The Commissioner makes the assessment of disability through a five-step sequential evaluation process.  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000).  The five steps are:

1. Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

4

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

## III.   FACTUAL BACKGROUND

### A.   The Hearing

A hearing was held before the ALJ on February 11, 2020 in Billings, Montana. (A.R. 37-83.) At the hearing, Esman testified to her current situation as residing with her significant other and unemployed. (A.R. 47-48.) Esman stated that since alleging disability on January 1, 2018, she had been employed as a delivery driver for Papa John's for a period of roughly three weeks in August of 2018. (A.R. 49.) Esman had previously held a similar job at Pizza Hut and, prior to that, an assistant manager position at a local hotel from 2004 to 2013. (A.R. 51, 74.) Since 2013, Esman has not held a full-time employment position. (A.R. 75.)

As to her everyday activities, Esman testified that three to four days a week she wakes up around 4:00 or 5:00 a.m. and becomes ill to the point she must grab a

nearby trashcan to vomit. The sickness continues until around noon, during which time Esman is confined to her bed. Even on days when she is not ill, Esman typically spends most of the morning in bed to take it easy and prevent herself from becoming sick. (A.R. 65.) In the afternoons, Esman testified she makes her way to the living room where she watches TV while sitting or laying on the couch. (A.R. 66.) She typically makes dinner in the evenings by heating up a frozen meal in the oven. (A.R. 67.) Esman stated that on good days, she will spend about 50% of the day laying down. On bad days, she spends around 90% of the day laying down. (A.R. 68.)

Esman testified next that she takes 19 prescribed medications for diabetes and pain, among other things. (A.R. 69.)  She has difficulty taking the pills at times because of swollen, painful limbs and experiences difficulty keeping the pills down on mornings when she is vomiting. (*Id.*) Esman testified that, as of the time of the hearing, she had experienced issues with vomiting for roughly a year and a half. She did inform her doctors of the issue and has a prescription for anti-vomit medication. (A.R. 70-71.)

As to Esman's limitations, she testified that she has been experiencing issues with numbness in her hands and feet for three years prior to the hearing. She was proscribed splints for her hands that she wears at night. (A.R. 71-72.) She was told that water aerobics might ease the issue, but she was unable to afford a

6

membership for the classes. (A.R. 73.) Esman also testified that the numbness limited her ability to lift objects as she frequently drops things. She stated that her limit to lift things was a gallon of milk if she used both hands. (A.R. 52.) She has difficulty with buttons and zippers and mostly wears clothes with Velcro fasteners now. (A.R. 53.) She uses a cane to assist her while walking as she trips and falls often. (A.R. 55.) She stated that she can walk five minutes before she needs to stop and take a break due to fatigue and pain from her right hip. (A.R. 56.) She is similarly limited to standing for no more than a few minutes at a time. (A.R. 58.) She testified that she is limited in driving distances to around 50 miles due to numbness in her hands. (*Id.*)

Last, the vocational expert ("VE"), Jerry Gravatt, summarized Esman's work history, rated them per DOT categories, and opined three jobs in the national economy existed under the hypothetical posed: office helper, a marker, and a garment sorter. (A.R. 79-80.) The ALJ then posed the same hypothetical but limited the hypothetical to sedentary work with the ability to be on one's feet for a total of two hours out of eight hours, lift 10 pounds occasionally and less than 10 pounds frequently, cannot kneel, and avoid concentrated exposure to extreme cold, vibrations, and moderate exposure to hazards. (A.R. 81.) The VE opined such a hypothetical would eliminate the previously suggested occupations but provided examples of other employment, including a bench hand, a final assembler, and a

7

preparer. (*Id.*) The ALJ then further limited the hypothetical by eliminating any job requiring repetitious use the left upper extremity. (A.R. 82.) The VE stated that the bench hand would be eliminated under that hypothetical, but the final assembler and preparer would remain. (*Id.*) Finally, the ALJ limited the hypothetical to include instances when the individual would need breaks exceeding the standard two 15-minute breaks in the morning and afternoon and the 30- or 60-minute break for lunch. The individual would also, on occasional, miss more than two workdays in a typical month. (A.R. 82-83.) The VE testified that these additional limitations would not allow for work at the substantial gainful activity ("SGA") level in the current economy. (A.R. 83.)

## B.   The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering Esman's claim. (A.R. 18.)

At step one, the ALJ found that Esman had not engaged in substantial gainful activity since her alleged onset date of January 1, 2018. (A.R. 23.)

At step two, the ALJ found Esman has the following severe impairments: type II diabetes mellitus with peripheral neuropathy; degenerative joint disease and soft tissue injuries of the right hip; obesity; and, as of September 2019, left carpal tunnel syndrome. (A.R. 24.) The ALJ also found that numerous impairments were

8

non-severe, including psoriatic arthritis and psoriasis; hypertension; moderate sleep apnea; gastroesophageal reflux disease; and depression and anxiety.  (A.R. 24-26.)

At step three, the ALJ found that Esman does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the appendix.  (A.R. 26-30.)

At step four, the ALJ stated Esman has the residual functional capacity ("RFC") to perform sedentary work with some restrictions, including never climbing ladders, ropes, or scaffolds; never kneeling or crawling; occasionally climbing ramps or stairs; occasionally balancing, stooping, and crouching; avoiding concentrated exposure to extreme cold, vibration and moderate exposure to hazards; never using the left upper extremity repetitiously on a constant basis but can use the left upper extremity on a frequent basis.  (A.R. 30.) However, the ALJ found that Esman is unable to perform any past relevant work.  (A.R. 34.)

Finally, at step five, the ALJ found that based on Esman's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform.  (A.R. 34-35.)

Accordingly, the ALJ found Esman not disabled.  (A.R. 35.)

IV.   **Discussion**

Esman argues that the ALJ erred in (1) discounting the findings, diagnoses, and objective test results of treating medical providers relative to her psoriatic

arthritis, peripheral neuropathy, chronic nausea, and vomiting; (2) discounting the credibility of her testimony; and (3) failing to incorporate all limitations into the vocational consultant's hypothetical. (Doc. 11 at 14-15.) The Court will address each in turn.

### A.    ALJ's Evaluation of Medical Source Opinions

Esman argues that the ALJ "improperly cherry picked medical records and chose to ignore the overwhelming majority of references in the records which establish both antalgic gait, peripheral neuropathy, carpal tunnel in the hands and pain and numbness in the hands." (Doc. 11 at 16.) The Commissioner argues that the ALJ carefully considered the available medical records and Esman's testimony and reasonably found that Esman did not have a severe impairment of psoriatic arthritis and psoriasis. (Doc. 18 at 25-26.)

In assessing whether an impairment is severe or not, an ALJ must consider the impairment's impact on the individual's ability to perform work-related tasks. An impairment is not considered severe if it does not significantly affect the individual's physical ability to perform those basic tasks such walking, standing, sitting, lifting, pushing, pulling, carrying, etc. *Smolen v. Charter*, 80 F.3d 1273, 1290 (9th Cir. 1996); 20 C.F.R. §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6). An ALJ must consider all impairments of the claimant and their combined effect on that individual, including the individual's subjective symptoms such as pain or fatigue.

*Smolen*, 80 F.3d at 1290. This step serves as a *de minimis* screening device for ALJs to dispose of groundless claims. Therefore, "[a]n impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individuals [sic.] ability to work.'" *Id.* (quoting SSR 85-28); (See also *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988).

Noted above, the ALJ found Esman severely impaired due to her type II diabetes mellitus with peripheral neuropathy, degenerative joint disease and soft tissue injuries of the right hip, obesity, and left carpal tunnel syndrome. (A.R. 24.) The ALJ found, however, that Esman's claim of impairment for psoriatic arthritis and psoriasis was not severe. (*Id.*) In doing so, the ALJ concluded the following:

> The claimant was evaluated by a rheumatologist in April 2018, and was diagnosed with psoriatic arthritis and psoriasis, for which she was prescribed Humira (3F/77-80). X-rays of the cervical spring, thoracic spine, lumbar spine, and bilateral hands were unremarkable (3F/85-88, 89, 91). X-rays of the bilateral feet revealed some abnormalities (3F/89). Subsequent exam one month later revealed the claimant has realized an excellent benefit for skin and moderate benefit for joints (3F/95). The claimant continued to show improvement thereafter, with essentially unremarkable exams within 12 months of the alleged disability on set (5F/15; see also, 7F/30, 39, 47). She experience [sic.] a flare in December 2019 (9F/16-17) that resolved in three days with appropriate treatment (9F/18). The medical evidence fails to establish the claimant continues to experience serious signs and symptoms of psoriatic arthritis and psoriasis over a 12-month period. The undersigned finds the claimant's medically determinable impairments of psoriatic arthritis and psoriasis do not cause more than minimal limitation in the claimant's ability to perform basic work activities, and are therefore nonsevere.

(A.R. 24.) Based on the above review, it appears that the ALJ carefully considered both Esman's testimony and the medical record before him in determining the status of Esman's psoriatic arthritis. The Court agrees with the Commissioner that Esman "has not provided any credible evidence of how she was significantly limited by psoriatic arthritis that lasted at least twelve continuous months." (Doc. 12 at 18.) Further, the Court is bound to uphold the Commissioner's decision even if the evidence presented may point to more than one rational interpretation and one of those interpretations supports the ALJ's determination. *Burch*, 400 F.3d at 679. The Court affirms the ALJ's determination regarding the severity of Esman's psoriatic arthritis and psoriasis.

**B.    Esman's Credibility**

Esman argues that the ALJ improperly discounted her testimony without providing specific, clear, and convincing reasons. (Doc. 11 at 14.) The Commissioner argues that the ALJ properly found the medical record contradicted Esman's testimony in several regards and provided convincing reasons for his decision. (Doc. 12 at 6.)

The Ninth Circuit has established a two-step analysis to determine the extent to which a claimant's symptom testimony must be credited. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ determines whether the claimant has provided objective evidence of an impairment or impairments that could

12

reasonably be expected to produce the pain or symptoms alleged. *Id.*; 20 C.F.R. § 404.1529(a), (c). If the claimant does so and there is no evidence of malingering, then at the second step the ALJ evaluates the intensity and persistence of the symptoms. *Vasquez*, 572 F.3d at 591.

To reject the claimant's testimony, the ALJ must provide "specific, clear and convincing reasons." *Id.* "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). Thus, the ALJ's credibility determination "must be supported by specific, cogent reasons," with general findings insufficient. *Reddick*, 157 F.3d at 722; *Lester*, 81 F.3d at 834. *See also* 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (A.R. 31.) Those symptoms include frequent vomiting three to four times per week, beginning early in the morning and lasting until early afternoon.

13

(A.R. 31). Esman has difficulty with numbness in her hands and feet. She alleged

that she frequently drops objects she is holding as a result and the maximum she

could lift with both hands is a gallon of milk. (*Id.*) She utilizes a cane for safety

when walking as she falls frequently and estimated she could walk for five minutes

at a time, stand for a couple of minutes, and sit for 20-30 minutes. (*Id.*) Esman also

stated she could drive a car for short distances of around 50 miles. (*Id.*) Finally, she

alleged difficulty concentrating, navigating stairs, and spends large chunks of the

day laying down as she estimated that on a good day she lies down 50 percent of

the day and 90 percent of the time on a bad day. (*Id.*)

The ALJ went on to review the available medical records and determined

several discrepancies existed between the reported evidence and Esman's claims.

The ALJ stated:

> The claimant suffers from Type II diabetes mellitus with peripheral
> neuropathy, confirmed on nerve testing (EMG/NCV) (7F/4-5). The
> claimant's A1c levels have improved from 11 to 8 with insulin and
> metformin therapy, as well as diet (3F/95; 4F/27; 9F/9, 22). In
> December 2017, the claimant indicated she stopped drinking Cherry
> Coke (4F/40). Even though testing is consistent with the claimant's
> complaints of numbness and tingling in the extremities, her strength
> and reflexes are normal (4F/15; 7F/4-5, 35, 52). In May 2019, the
> claimant's treating physician characterized the claimant's neuropathy
> as a "mild presentation" (7F/32). Recently, in November 2019, the
> claimant's medical provider noted the claimant denied persistent
> numbness or weakness in hands (9F/1). The claimant's testimony
> regarding alleged difficulties using the hands are inconsistent with this
> recent report. While it is certainly reasonable to conclude the claimant's
> lower extremity neuropathy would preclude prolonged standing and
> walking, there is no reasonable medical basis to conclude that sitting

14

would be affected by neuropathy. The claimant's testimony that she used a cane for the past 1 1/2-2 years for safety because she falls and trips a lot is inconsistent with the contemporaneous medical records revealing the claimant was able to walk without an assistive device through at least March 2019 (4F/4; 8F/2, 16, 18, 20). There is no evidence in the contemporaneous treatment records that the claimant that the claimant [sic.] has reported frequent falls or tripping since the alleged disability onset date.

The claimant's testimony, and her representative's brief (17E), stress the frequency of episodes of vomiting as work preclusive. The undersigned has carefully reviewed the evidence of record, and finds only a few references to vomiting in the file. In August 2018, the claimant's medical provider noted "rare vomiting" 2-3 times a week, for which she was prescribed Reglan (4F/4-5). In July 2019, the claimant's medical provider noted reports of only "intermittent vomiting" (7F/19). There are other references to chronic nausea without mention of vomiting (7F/7, 40, [sic.] There is no description in the medical record of episodes of frequent vomiting occurring 3-4 days a week, lasting for 6-8 hours each day. A gastric emptying study in May 2019 was negative (7F/31), suggesting symptoms are not associated with diabetic gastroparesis. There is no evidence of weight loss, dehydration, hypokalemia, or other complications arising from frequent or recurrent vomiting. The claimant has not required emergency room care or inpatient hospital stay for complications associated with frequent vomiting. The undersigned concludes the claimant's testimony regarding the frequency of vomiting is not supported by the objective medical findings and other evidence of record.

(A.R. 31-32). The ALJ also discussed Esman's complaints of pain in her right hip for which injections have not achieved significant relief. Yet, no medical provider has recommended surgery and treatments were able to assist with range of motion and strength in her lower extremities. (A.R. 32). Considering this evidence together, the ALJ concluded that Esman's symptoms warranted limitations on her RFC but no more than the ones the ALJ recommended. (*Id.*).

Based on this review, the Court finds that the ALJ provided specific, clear, and convincing reasons to discount Esman's testimony relating to her symptoms. The ALJ cites numerous opinions from Esman's medical providers about the care given to Esman to address her specific complaints. The Court's own review of the medical records supports the ALJ's findings. The ALJ further distinguished Esman's claims regarding the severity of her symptoms with her own statements about her daily activities, noting that Esman indicated she could handle personal care with some difficulty, prepared meals, handled pet care, drove short distances in cars, performed household chores, and shopped alone for grocery and personal items. (A.R. 33). While Esman may not agree with the ALJ's determination that more restrictive limitations were warranted given the Claimant's testimony, it does not appear that the ALJ arbitrarily disregarded her statements. This Court may not have evaluated the evidence in the same way as the ALJ, but the Court may not substitute its own interpretation of the evidence for the ALJ's interpretation. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (stating that as long as the ALJ's credibility finding is supported by substantial evidence in the record, the court "may not engage in second-guessing.")

## C.   Vocational Consultant's Hypothetical

Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant. *Embrey v. Bowen*, 849 F.2d

16

418, 422 (9th Cir. 1988). "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d at 756 (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)). If the assumptions in the hypothetical are not supported by the record, then the vocational expert's opinion that the claimant has a residual working capacity has no evidentiary value. *Embrey*, 849 F.2d at 422.

Esman argues that the hypothetical the ALJ relied on to find she could perform other work at step five was deficient because it did not incorporate all of her limitations. Specifically, Esman asserts the ALJ failed to incorporate several of her persistent symptoms and "failed to present the vocational consultant with the limitations imposed by SSR 96-8p including the frequency and duration of treatment and side effects of medication . . . ." (Doc. 11 at 26). An ALJ's failure to consider the effect of a claimant's treatment needs constitutes reversible error. *See e.g. Tyler v. Saul*, 2021 WL 2562492, *6 (D. Mont. June 23, 2021) (finding ALJ erred by failing "to note, weigh, or otherwise consider the frequency of treatment entirely in their decision"); *Mariah v. Saul*, 2021 WL 1660947, *8 (D. Mont. April 28, 2021) (remanding action where the ALJ failed to consider the plaintiff's treatment needs in assessing the RFC); *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980) (finding the ALJ's decision was not supported by substantial evidence because the effect of the claimant's treatment regimen for back injury was

17

ignored); *Kim v. Saul*, 2020 WL 872308, *9-11 (D. Minn. Jan. 28, 2020) (holding
that where the objective evidence showed the plaintiff had medical appointments
on more than 50 days in a 33-month period, "the ALJ must explain how this course
of treatment is reconcilable with the vocational expert's testimony regarding
tolerated absences").

At the hearing, the ALJ posed several hypotheticals to the vocational expert,
each more restrictive than the last. (A.R. 80-83). The vocational expert responded
to each hypothetical that, while the types of occupations were limited by Esman's
abilities, there were jobs in the economy she could perform. (*Id.*). The ALJ then
discussed a hypothetical where the individual would require frequent breaks
throughout the day whether from pain or exhaustion that would exceed the two 15-
minute breaks typically provided by employer or that the individual would
occasionally miss more than two workdays in a month for whatever reason. (A.R.
82-83). The vocational expert responded that these limitations would not allow an
individual to work at the SGA level and find competitive employment in the
current economy specifically citing to the need for time off task and missed days.
(A.R. 83). Despite this response, the ALJ failed to include any mention of the
discussion in his final decision. (A.R. 34-35). Esman contends this failure to
consider the need for multiple absences from work a month due to medical visits
and other needs was in error. Esman asserts, as demonstrated by the medical

18

record, that in 2018 she was seen 27 times for medical visits. In 2019, Esman had 20 medical visits. (Doc. 11 at 14). By Esman's calculation, this amounts to 2.25 medical visits per month in 2018 and 1.67 medical visits in 2019. (*Id.*). Obviously, Esman's need for time off work to attend medical appointments will fluctuate from month to month, but the Court is persuaded by Esman's argument, supported by the medical record, that her impairments have required extensive medical care and will continue to do so in the future. Therefore, the Court finds the ALJ's failure to consider the side effects of Esman's treatment, including the documented need to miss workdays for medical visits, constitutes reversible error.

## V.       REMAND OR REVERSAL

Esman asks the Court to reverse the ALJ's decision and grant her benefits. (Doc. 11 at 32.) "[T]he decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court." *Reddick*, 157 F.3d at 728.  If the ALJ's decision "is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Hill*, 698 F.3d at 1162 (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of

benefits, reversal [and an award of benefits] is appropriate." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate. On remand, the ALJ shall reconsider the weight he applies to the side effects of Esman's medical treatment including the possible need for additional breaks during a typical workday and her possible need to miss multiple workdays in a month for doctor visits.

## VI.     CONCLUSION

For the foregoing reasons, the Court orders that the Commissioner's decision is REVERSED, and this matter is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

**IT IS ORDERED**.

DATED this 2nd day of November, 2021.

*Susan P. Watters*

SUSAN P. WATTERS
United States District Judge